## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARGARET D. ENGLISH, Individually )
and as Personal Representative of )
The Estate of Michael English, Deceased, )
522 49th Street N.E. )
Washington, D.C. 20019 )
                                  )
         Plaintiff, )     Civil Action No. 1:15-cv-00225
     v. )     JURY TRIAL DEMANDED
                                    )
THE UNITED STATES OF AMERICA, )
                                    )
         Defendant. )

## COMPLAINT

Plaintiff, Margaret English, individually, and as the Personal Representative of the Estate of Michael English, by and through counsel, brings this action and states as follows:

## JURISDICTION AND VENUE

1.     This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680. Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1346(b)(1).

2.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(e) and 1402(b) as the acts of negligence occurred in the District of Columbia and the Plaintiff is a resident of the District of Columbia.

## PARTIES

3.     The decedent, Michael English ("Mr. English"), was a resident of the District of Columbia.  He died at age 22.  The Personal Representative of the Estate of Michael English, Plaintiff Margaret English, is a resident of the District of Columbia.

4.     Unity Health Care, Inc. ("Unity") is a corporation licensed to and doing business in the District of Columbia.  Unity is contracted with the District of Columbia's Central

Detention Facility ("CDF") to provide general health care and mental health care services to prisoners.

5.       Unity is a grantee of the Department of Health and Human Services ("HHS") and a Public Health Service employee under 42 U.S.C. 233(g)-(n).

## ADMINISTRATIVE PROCEEDINGS

6.       On July 25, 2014, Plaintiff's counsel submitted an administrative claim for relief pursuant to 28 U.S.C. § 267 and 28 C.F.R. § 14.  Plaintiff alleged Unity and its agents/employees through negligent actions, inactions, and failure to perform duties, proximately and directly caused the death of Michael English.  The administrative claim was received on July 29, 2014.

7.       Six months have passed since Plaintiff presented her claim and the United States has not denied the claim.

## FACTS

8.       Until 2010, Mr. English was an ordinary, home loving, and studious young man with no criminal record.

9.        During 2010, Mr. English began to show signs of mental illness while he was a college sophomore at Lincoln University in Pennsylvania.

10.      Concerned about his changing mental state, Mr. English met with a school counselor.

11.      By the beginning of 2011, Mr. English's mental instability intensified.  He began to suffer from paranoia and would confine himself to his room for long periods.

12.      In 2011, Mr. English withdrew from Lincoln University and went to live with his mother in Richmond, Virginia.

13.    In 2011, concerned about his well-being, the English family hospitalized Mr. English at George Washington University Hospital ("GWUH").   At GWUH, Mr. English was diagnosed with paranoid schizophrenia.  Health care providers informed the family that paranoid schizophrenia commonly manifests in males of the same age as Mr. English.

14.    At GWUH, doctors prescribed medication to treat Mr. English's mental condition.

15.    In 2011 and early 2012, Mr. English presented to Seton House, a mental health facility at Providence Hospital, for further inpatient care of his mental illness.

16.    After suffering a paranoid delusion in May 2011, Mr. English told his mother that he may have had inappropriate contact with a family member.  Given his whereabouts at the time of the delusion, it was unlikely that Mr. English could have had such contact.

17.    Nonetheless, the family reported the incident to authorities and Mr. English spent time at the CDF.  During this brief incarceration, Defendant became aware of Mr. English's mental illness.

18.    In August 2011, several of Mr. English's family members, including English's father, William English, wrote a letter to a Superior Court Judge requesting that in light of this incident the District provide Mr. English with needed mental health services and for "a safe environment to start addressing his issues."

19.    Mr. English's probation officer told the court that "[t]his officer is extremely concerned about Mr. English's well-being, as well as the safety of the community."

20.    In February 2012, while suffering another paranoid delusion on the Metro, Mr. English believed that a Metro rider's umbrella was speaking to him.  Mr. English took the rider's umbrella.  When Metro police questioned Mr. English, they found a knife in his possession. Although Mr. English had not used the knife, he was arrested.

21.     As a result of this incident, Mr. English was sent to Western State Hospital in Staunton, Virginia.  He remained there for several months while he was treated for his mental illness.

22.     On October 30, 2012, during a schizophrenic episode Mr. English became involved in an altercation with a friend.

23.     As a result, the MPD arrested Mr. English and placed him at the CDF.

24.     Despite being aware of Mr. English's mental illness and his reliance on medication to control the disease, Defendant initially refused to provide Mr. English with his medication.

25.     Despite being aware of Mr. English's mental illness, Defendant refused family visits to Mr. English, who emotionally relied upon his family during mental-illness episodes.

26.     As one example of family attempts to visit Mr. English, Margaret English made multiple online appointments to visit her son at CDF, all of which were rejected.

27.     Ms. English also called the CDF on multiple occasions seeking to visit her son. Each time she was told she could not see him because of "behavioral reasons."

28.     Around the time of his pretrial hearing, Mr. English's attorney, Russell Bikoff, Esq., filed a medical-alert form alerting officials of Bikoff's concerns about Mr. English's mental illness and his overall well-being at CDF.

29.     Several weeks after his arrest, Mr. Bikoff or his agent spoke with Bruce Reid. Mr. Reid was the mental-health director for Unity.  During this conversation, Reid was specifically informed of Mr. English's mental illness and his poor well-being at CDF, and was asked to look into the situation.

30.     Mr. Reid responded that Defendant would look into the situation.

31.     After allegedly throwing an unknown substance at a guard, Defendant placed Mr. English in the South One Housing Unit, a Special Management Unit for inmates that require a higher degree of care and supervision for behavioral issues.

32.     At some point, Defendant placed Mr. English on "Behavioral Observation."

33.     Throughout his incarceration, Unity never placed English in the Mental Health Unit (South 3).

34.     Throughout his incarceration, Defendant did not place Mr. English on suicide watch or utilize suicide precautions despite knowing that Mr. English was mentally ill and exhibiting dangerous signs.

35.     Throughout his incarceration Defendant only briefly placed Mr. English in a suicide-resistant cell.  Despite further exhibitions of abnormal and erratic behavior, Defendant placed Mr. English in a cell with a sheet and an anchoring device, which should not be used with mentally-ill inmates.

36.     Throughout his incarceration Defendant kept Mr. English in isolation.

37.     Throughout his incarceration Defendant failed to implement suicide-prevention mechanisms for Mr. English, such as removing items that could be used to commit suicide, providing proper treatment of his mental illness, and allowing socialization with his family.

38.     On November 30, 2012, at approximately 2:36 p.m., a CDF employee found Mr. English unresponsive and hanging with a bed sheet tied around his neck.

39.     Defendant and a Medical Emergency Response Team ("MERT") did not respond to the emergency for ten minutes.

40.     A CDF Warden, present during the attempt to resuscitate English, noted MERT appeared disorganized and essentially in a state of chaos responding to English's grave emergency.

41.     On November 30, 2012, at approximately 3:49 pm, English was pronounced dead after Defendant's life-saving efforts failed.

42.     English died awaiting his criminal responsibility assessment scheduled for December 2, 2012, and mental observation hearing scheduled for December 14, 2012.

43.     On November 30, 2012, the South One unit logbook noted that security checks were performed on Mr. English's unit at 8:10 a.m., 8:32 a.m., 9:30 a.m., 9:49a.m., 11:00 a.m., 11:30 a.m., 12:02 p.m., 12:30 p.m., 1:02 p.m., 1:31p.m., and 2:00 p.m.

44.     All security check entries after 9:49 a.m. were false and fraudulent.

45.     The Office of Investigate Services ("OIS") reviewed the unit logbook and video footage of security checks performed on Mr. English's unit, and determined that no one performed a security check of Mr. English's cell after 10:00 a.m. on November 30, 2012.  In other words, no one checked on Mr. English from 10:00 a.m. until he was found dead, a period of over four hours.

46.     The unit log book also falsely noted that Mr. English made a telephone call on November 30, 2012.

47.     Mr.  English never made, nor was he allowed to make, any phone calls throughout his incarceration.

48.     On November 30, 2012, the Window and Bar check form noted that a security check was performed on Mr. English during the day shift.

49.     The OIS analysis of video footage revealed that no security checks were conducted that correlate with the log book, no phone call was made, and no windows and bar check was performed.

50.     On November 30, 2012, a Security Activity Record ("SAR") form was prepared by the unit officers.  A SAR form is unique to the Special Management Unit and is designed to document inmate behavior and the time of such behavior.

51.     According to the SAR form, Mr. English was "reading" at 2:38 p.m., 3:08 p.m., and 3:39 p.m.

52.     The SAR is false and fraudulent as Mr. English was found unresponsive at 2:36 p.m. and was pronounced dead by 3:49 p.m.

53.     According to the investigation, a prison employee admitted to fraudulently completing the form prior to the 3:00 p.m. unit count.

54.     A South One Sergeant further admitted that he was aware that officers "pre-recorded" observations on SAR forms.

55.     The OIS investigation revealed that during a 2012 "Mock Audit" the South One unit Officers were not conducting thirty-minute rounds.

56.     On November 30, 2012, the Zone One Supervisor never entered the South One Housing Unit.

57.     The OIS investigation reported that South One Unit Officers claimed they were inadequately staffed.

## COUNT I
### (NEGLIGENCE)

58.     Plaintiff incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

7

59.     Defendant owed a contractual duty to provide medical and mental health care to the inmates in the CDF.

60.     Defendant had a duty to exercise reasonable care in performing these duties.

61.     Defendant's duties included ensuring that CDF had appropriately trained personnel and professionals to care for mentally ill inmates like English.

62.     Defendant's duties included the duty to ensure that all inmates are given a mental health screening during intake, and ensure that inmates exhibiting signs of potential suicidal or other unusual behavior undergo rigorous analysis and are to be treated with a heightened degree of care.

63.     Defendant's duties included providing inmates with chronic illnesses continuous and appropriate health services to prevent or reduce complications of chronic illnesses and promote health maintenance.

64.     Defendant's duties included developing a treatment plan for all inmates diagnosed with a chronic condition.

65.     Defendant's duties included providing mental health assessments, controlling, dispensing, and monitoring administration of medication, providing treatment for inmates with the most severe forms of mental illness, handling psychiatric emergencies, and taking appropriate preventative measures to ensure the safety and well-being of inmates with serious mental illnesses.

66.     Defendant negligently breached its duty of care and protection and negligently provided substandard care to English in the following manner:

        a.   failing to provide English with medication for a serious and known mental
             illness;

b.  failing to adequately assess English's mental well-being in a reasonable and timely manner;

c.  failing to follow the written procedures of both CDF's and Unity's suicide prevention policies;

d.  failing to keep English in a safe cell, place him on suicide watch or suicide precaution despite his known mental illness, erratic, delusional, self-harming behavior and Unity's actual knowledge of English's condition;

e.  placing English under the unauthorized and overly punitive practice of behavioral observation;

f.  failing to properly monitor, log, and accurately assess observations of English's mental well-being;

g.  failing to provide adequate medical care, and failing to establish an adequate care plan which would have prevented the reasonably foreseeable death of English;

h.  failing to respond to English's grave emergency in a timely manner, that is failing to respond to a suicide attempt within the DOC's mandatory four minutes or less emergency response time;

i.  failing to follow accepted and standard medical procedures and safety methods when caring for and supervising English; and

j.  was otherwise negligent.

67.  Defendant owed English the duty to exercise the degree of care, skill, and diligence ordinarily used by responsible health care providers in the hiring and retention of appropriate personnel.

68.     Defendant had a duty to hire sufficient personnel to adequately support the needs of mentally ill inmates under its care, such as English.

69.     Defendant had the duty to train and supervise its employees to meet all of the medical, emotional, and psychological needs of English.

70.     Defendant breached its duties by (i) hiring and retaining untrained and incompetent staff, (ii) failing to adequately train and supervise its employees and personnel.

71.     As a direct and proximate result of the Defendant's negligence, English suffered injuries and death.

72.     As a direct and proximate result of the Defendant's negligence, Ms. English and the next-of-kin beneficiaries have suffered, and will continue to suffer mental anguish, loss of society, companionship, guidance, kindly offices and advice and the reasonably expected loss of income and services, protection, care and assistance provided by English, and all other damages recoverable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the United States of America, including exemplary damages, in the amount of $10 million, and for all other relief deemed just and proper.

## COUNT II
### (SURVIVAL ACT)

73.     Plaintiff incorporates by reference paragraphs 1 through 57 as though fully set forth herein.

74.     Plaintiff further alleges that this claim arises under the District of Columbia Survival Statute, D.C. Code § 12-101, *et seq.*

75.     As a direct and proximate result of the negligent conduct of the Defendant, its agents, servants, and/or employees, Mr. English is now deceased, but not before experiencing great pain, mental anguish, and suffering.

76.     Mr. English's right of action for wrongful death and the negligent conduct against the Defendant and/or its agents, servants, and/or employees, survives in favor of Plaintiff Margaret English, as Personal Representative of the Estate of Michael English.

WHEREFORE, Plaintiff demands judgment against the United States of America, including exemplary damages, in the amount of $10 million, and for all other relief deemed just and proper.

## COUNT III
## (WRONGFUL DEATH)

77.     Plaintiff incorporates by reference paragraphs 1 through 5726 USC  2671 as though fully set forth herein.

78.     This claim arises under the District of Columbia Wrongful Death Statute, D.C. Code § 16-2702, *et seq*.

79.     As a direct and proximate result of the negligent and/or wrongful conduct of the Defendant, its agents, servants, and/or employees, Michael English is now deceased.

80.     As a direct and proximate result of the negligent and/or wrongful acts of Defendant, Ms. English and next of kin have incurred expenses of the decedent's burial and have suffered and will continue to suffer loss of society, companionship, guidance, kindly offices and advice and the reasonably expected loss of income and services, protection, care and assistance provided by English, and all other contributions of decedent awardable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the United States, including exemplary damages, in the amount of $10 million, and for all other relief deemed just and proper.

Respectfully submitted,

PERRY CHARNOFF PLLC


_____/s/_____
Scott M. Perry (#459841)
Mikhael D. Charnoff (#476582)
2300 Wilson Boulevard, Suite 240
Arlington, VA 22201
P: (703) 291-6650
F: (703) 563-6692
scott@PerryCharnoff.com
mike@PerryCharnoff.com
*Counsel for Plaintiff*


## **JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by a jury on all issues in this Complaint.


_____/s/_____
Scott M. Perry